## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                          CASE NO. 6:12-bk-15882-KSJ

WSG CORAL SPRINGS, LP,                          CHAPTER 11

                        Debtor.

_____/

### DEBTOR'S MOTION TO EQUITABLY SUBORDINATE
### UNSECURED CLAIM OF BRANCH BANKING & TRUST COMPANY

WSG CORAL SPRINGS, LP ("WSG" or "Debtor"), by and through its undersigned

counsel, and pursuant to § 510(c) of Title 11 of the United States Code (the "Bankruptcy Code"),

hereby moves to equitably subordinate the allowed unsecured claim of Branch Banking & Trust

Company ("BB&T"), and in support states as follows:

#### Summary of Argument

BB&T's allowed unsecured claim, if any, should be equitably subordinated under § 510(c) of

the Bankruptcy Code because BB&T directly and intentionally harmed the Debtor by, among other

things, materially breaching forbearance agreements BB&T had with the Debtor and by tortiously

interfering in negotiations with a third-party creditor of the Debtor in a separate litigation matter

involving the Debtor.

As a result of BB&T's breach of contract and its unlawful interference, the Debtor has been

unable to develop its property (described below) and the anticipated resolution of the litigation

involving the Debtor fell through, thereby damaging the Debtor. Accordingly, under § 510(c) of the

Bankruptcy Code this Court should equitably subordinate BB&T's unsecured claim to the claims of

all other general unsecured creditors.

-1-

**Background**

I. **Description of the Debtor, its Business, and the Project.**

      1.     The Debtor is a multi-partner, Delaware limited partnership formed on July 8, 1999, to hold and develop a retail/multi-family development complex consisting of approximately 43.34 acres of real property known as the "Alafaya Trail Property Planned Development," which was developed into a retail area now known as "Waterford Lakes Retail" across from "Waterford Lakes Town Center" in East Orlando, Florida (the "Project").

      2.     The Project was divided into three (3) phases on various parcels of land. Phase I and Phase II have been completed. Phase I has a combined "Babies 'R' Us" and "Toys 'R' Us" retail super store and a "Bahama Breeze" and "Jason's Deli" restaurants on its parcels. Phase II has a "Dick's Sporting Goods" on its parcel.

      3.     Upon completion of Phases I and II, the Debtor sold those properties to HM Eight, LLC ("HM8") and HM Four, LLC ("HM4"), respectively. The proceeds from the sale of Phase I and II, approximately $10.2 million were promptly delivered to Debtor's secured lender on the Project, BB&T, which had previously given the Debtor an $11.7 million loan for the development of the Project.

      4.     Phase III is vacant land behind the Project. Phase III is conservation land that was required for development of the Project by the St. Johns Water Management District (the "St. Johns Water") and it consists of 28.77 acres of the Project. As it did with Phases I and II, the Debtor plans on converting Phase III into developable property (with approximately 7 acres devoted to commercial development of at least 100,000 square feet of commercial space, and the remaining acres for multi-family use) thereby significantly increasing its value.

-2-

5.      Towards that end, the Debtor has been in the process of negotiating, purchasing, and exchanging conservation mitigation credits with St. Johns Water for over the past six (6) months. Conservation mitigation credits were needed for the entire Project. However, the only remaining parcels that require the credits are the two parcels in Phase III.

## II. The BB&T Loan and Phases I and II.

6.      On or about April 26, 2006, as part of its development of the Project, the Debtor executed and delivered to BB&T's predecessor-in-interest, Colonial Bank, N.A. ("Colonial"), a certain promissory note in the original principal amount of $6,760,000.00 ("First Note"). On or about March 22, 2007, the Debtor executed and delivered to Colonial a certain promissory note in the original principal amount of $240,500.00 ("Second Note"). On or about August 27, 2007, the Debtor executed and delivered to Colonial that certain consolidated and restated renewal and future advance promissory note in the principal amount of $11,740,000.00 ("Renewal Note").

7.      By virtue of a mortgage, assignment of leases and rents and security agreement ("Mortgage"), which was executed by the Debtor in favor of Colonial and recorded on May 9, 2006, in Orange County, Florida, the Renewal Note is secured by, *inter alia*, a lien against the Property. The First Note, Second Note, Renewal Note, Mortgage and all related documents executed and/or delivered in connection with the Loan are referred to collectively hereinafter as the "Loan Documents".

8.      On August 14, 2009, the FDIC seized the assets of Colonial and substantially all such assets, including the Loan Documents, were transferred to BB&T.

9.      On or about January 3, 2011, BB&T commenced a foreclosure action against, *inter alia*, the Debtor, in Case No. 2011-CA-000033-O in the Circuit Court of the 9th Judicial Circuit, in and for Orange County, Florida (the "Foreclosure Action").

10.     On or about July 29, 2011, BB&T, Debtor, Eric D. Sheppard ("Sheppard") and Phillip Wolman ("Wolman") entered into a forbearance stipulation (the "Forbearance Stipulation"). The Forbearance Stipulation provides, *inter alia,* at paragraph 4 that BB&T agrees not to collect default interest and late fees. A true and correct copy of the Forbearance Stipulation is attached hereto as **Exhibit "A"**.

11.     At all times, the Debtor acted in good faith with BB&T under the Forbearance Stipulation, and as long as the Project was being developed and was progressing, despite language in the Forbearance Stipulation to the contrary, the parties agreed to allow interest to accrue. In fact, BB&T had agreed to allow all interest to accrue prior to the execution of the Forbearance Stipulation, as long as there was progression in the development of the Project.

12.     Phase I was sold and the proceeds of the sale delivered to BB&T in the amount of $5.833 million.

13.     Prior to the closing of the sale of Phase I, despite the fact that the Forbearance Stipulation called for the collection and payment of interest (and despite the fact that, by agreement of the parties, interest had been accruing since July 2010), BB&T agreed (orally and by course and conduct) not to collect any interest (default or otherwise) on the Loan so long as the Debtor performed under the terms of the Forbearance Stipulation, which the Debtor did.

14.     Then, at the closing of the sale of Phase I all accrued but unpaid interest was due and Debtor promptly paid it off.

-4-

15.    After the closing of Phase I, on or about September 2, 2011, BB&T, Debtor, Sheppard and Wolman entered into an Amended Forbearance Stipulation (the "Amended Forbearance Stipulation"). A true and correct copy of the Amended Forbearance Stipulation is attached hereto as **Exhibit "B"**.

16.    At all times, the Debtor acted in good faith with BB&T under the Amended Forbearance Stipulation, and as long as the Project was being developed and was progressing, despite language in the Amended Forbearance Stipulation to the contrary, the parties agreed to allow interest to accrue.

17.    Phase II was sold and the proceeds of the sale totaling approximately $4.371 million were delivered to BB&T in or about April 2012.

18.    Prior to the closing of the sale of Phase II, despite the fact that the Amended Forbearance Stipulation called for the collection and payment of interest, BB&T agreed (orally and by course and conduct) not to collect any interest (default or otherwise) on the Loan so long as the Debtor performed under the terms of the Amended Forbearance Stipulation (and the Project progressed towards development), which the Debtor did.

19.    Then, at the closing of the sale of Phase II all accrued but unpaid interest was due and Debtor promptly paid it off.

### III. Phase III and the Alleged Default.

20.    After the closing of Phase II, on or about April 24, 2012, BB&T, Debtor, Sheppard and Wolman entered into a Second Amended Forbearance Stipulation (the "Second Amended Forbearance Stipulation"). A true and correct copy of the Second Amended Forbearance Stipulation

is attached hereto as **Exhibit "C"**. At all times, the Debtor acted in good faith with BB&T under the Second Amended Forbearance Stipulation.

21.    The Debtor continued working on developing Phase III so that it could be sold and the proceeds delivered to BB&T (as Phases I and II were) in late 2013.

22.    Just as it had done with Phases I and II, despite the Second Amended Forbearance Stipulation, which called for the collection of interest, BB&T agreed (orally and by course and conduct) not to collect any interest (default or otherwise) on the Loan so long as the Debtor performed under the terms of the Second Amended Forbearance Stipulation (and the Project progressed towards development), which the Debtor did.

23.    Upon payment of the $4.371 million from Phase II (which was made in April 2012), it was agreed to by BB&T and the Debtor that all accrued but unpaid interest (and remaining principal) for the development of Phase III would be due by December 2013 and the Debtor would promptly pay it off, as it had done with Phases I and II.

24.    However, within thirty (30) days of the closing of Phase II, after receiving approximately $10.2 million from the proceeds of the sale of Phases I and II (on an $11.7 million loan), BB&T falsely declared a "default" under the Second Amended Forbearance Stipulation.

25.    That is to say, for the first time, despite agreeing (orally and by course and conduct) throughout Phases I and II not to collect any interest on the loan while the forbearance agreements were in effect and the Debtor was complying with their terms, BB&T reneged on its agreement to forbear on the interest and demanded immediate payment of monthly interest, which the Debtor could not do.

26.    In addition, the Debtor is in on-going negotiations with national tenants to occupy

anticipated space in Phase III. However, due to BB&T's actions, this process has been hindered and has prompted the instant bankruptcy.

27.     Further, as a result, in the Foreclosure Action, BB&T claimed that the Debtor, Sheppard and Wolman "defaulted" under the Second Amended Forbearance Stipulation by, *inter alia*, failing to tender payment of $21,539.14 in interest, allegedly due to BB&T on May 6, 2012.

28.     Thereafter, on June 29, 2012, the Court, entered an Amended Final Judgment of Foreclosure in the amount of $3,558,844.00 (the "Foreclosure Judgment"), and the foreclosure sale of the Property was subsequently noticed for November 27, 2012. The total amount due and owing under the Foreclosure Judgment as of the Petition Date is alleged to be $3,628,124.77.

29.     Additionally, since the alleged "default," BB&T has obstinately refused to sign-off on documents that are necessary to the development (and ultimate completion) of Phase III, *e.g.*, subordination agreements with proposed tenants and other documents required by Orange County to develop the land. These actions have prevented the Debtor from completing its development of Phase III and materially damaged the Debtor.

### IV. BB&T's Further Actions Adverse to Debtor.

30.     In addition to the foregoing, on or about November 19, 2007, CDS Sitework & Trucking, Inc. ("CDS") entered into a sub-contract for earthwork services with WSG Building Corporation ("WSG Building") for Phase I of the Project. CDS was retained to remove mud and marsh land and import suitable fill for development of the Project.

31.     On June 30, 2008, CDS filed a lien foreclosure action in the amount of $1,697,228.43 (the "CDS Lien") against Debtor and WSG Building, along with several other defendants (the "CDS Lawsuit"). The CDS Lawsuit is pending in Orange County Circuit Court, Case No. 48-2008-CA-

16081-O. The dispute in the CDS Lawsuit centers on the CDS subcontract, which had an estimated contract price of nearly $1.7 million, which was fully paid.

32.    However, just before CDS left the Project it submitted multiple change orders to Debtor and WSG Building totaling approximately $1,697,228.43, effectively doubling the estimated contract price.  CDS claims it performed all of this additional work and the Debtor (and WSG Building) disputes this amount.

33.    Nonetheless, due to the CDS Lien on Phase I, Babies and Toys 'R' Us would not accept Phase I unless the lien was satisfied.  Consequently, the Debtor sought refinancing with Bancorp Bank ("Bancorp") to assist in the closing of Phase I and to "bond-off" the CDS Lien.

34.    As a result, on or about August 31, 2011, approximately $2.5 million was placed in escrow with First American Title Insurance ("First American") for the purpose of bonding-off the CDS Lien.  A true and correct copy of the Escrow Letter Agreement is attached hereto as **Exhibit "D"** ("Escrow Letter").

35.    Under the Escrow Letter, Bancorp escrowed $2,150,000 with First American for the CDS Lawsuit (the "CDS Escrow Funds") in connection with the refinancing.

36.    The parties to the Escrow Letter (Debtor, First American, Bancorp and HM8) also agreed that in consideration of BB&T agreeing to further reduce the release amount due from the Debtor for Phase II by $350,000 – and thereby permit a closing of Bancorp's refinancing of the Project – upon the settlement of the CDS Lawsuit, any CDS Escrow Funds in excess of the final settlement amount with CDS would be released from escrow directly to BB&T and used to pay down the amounts due on or before April 30, 2012 (the Phase II release date) under the Amended Forbearance Stipulation.

37.    Thereafter, on or about September 1, 2011, First American exercised its discretion and used the entire escrow to bond the CDS Lien off with Platte River Insurance Company ("Platte River"), as surety. Platte River issued a bond (the "Bond") to release the CDS Lien on behalf of the Debtor, as bond principal, and in favor of CDS, as bond oblige. In connection with the issuance of the Bond, Platte River holds a General Indemnity Agreement and a Security Agreement from both the Debtor and First American.

38.    CDS subsequently amended its Complaint in the CDS Lawsuit and added Platte River as a Defendant. In its lawsuit, CDS requests that the Court find a lien to exist in favor of CDS in the amount of $1,697,228.43, together with costs, interest and attorneys' fees and a judgment finding that Debtor and Platte River are liable under the Bond, jointly and severally, for the amount of the lien.

39.    In mid-August 2012, CDS took the deposition of Ms. Lina Macki, the corporate representative of Colonial Bank, the predecessor-in-interest to BB&T. During the deposition BB&T's lawyers (who were present, but not involved in the CDS Lawsuit) learned about the Bond with Platte River. Until this time, BB&T claimed it was unaware of the Bond that was posted for the benefit of the Debtor and CDS.

40.    At the conclusion of the deposition, in response to a request from the court reporter regarding ordering a transcript of the deposition, the attorney for CDS declined and verbally indicated to all present that the CDS Lawsuit would be settling in the short term.

41.    As a result, immediately thereafter, BB&T filed an "Emergency Petition for Preliminary Injunctive Relief and/or Order Preventing Platte River from Distributing Excess Bond Collateral." BB&T alleged that it had information that settlement of other litigation (*i.e.*, the CDS

Lawsuit) was "imminent" and therefore it needed the injunction to prevent Platte River from releasing the Bond to anyone other than BB&T. That matter is currently pending in Orange County Circuit Court and is styled: *In Re: The Petition of Branch Banking & Trust Company for Injunctive Relief and/or Order Preventing Plat River Insurance Company (Capital Insurance Companies) From Distributing Excess Bond Collateral*; Case No. 2012-CA-14185 (the "BB&T Injunction Lawsuit").

42.    On August 27, 2012, the Court in the BB&T Injunction Lawsuit, on an *ex parte* basis, entered an order granting BB&T's emergency petition, thereby preventing Platte River "from disbursing or distributing excess proceeds of/or collateral used to secure" the Bond "to any person or entity other than BB&T." (the "BB&T Injunction")

43.    The BB&T Injunction violates the bargained-for rights of Platte River pursuant to the terms of its agreements with the Debtor and First American (in addition to a violation of due process and equal protection). Stated plainly, BB&T's Injunction bars Platte River from using the Bond (posted by the Debtor) for its contractually entitled right to pay claims relating to the Bond.

44.    Moreover, as a result of BB&T's Injunction (and intentional interference in the anticipated settlement of the CDS Lawsuit), CDS discovered that any "excess" from a settlement it (CDS) may reach with the Debtor will go to BB&T to pay down on Phase II. Consequently, CDS pulled out of any further negotiations with Debtor to resolve the CDS Lawsuit. Simply put, it is now more difficult for the Debtor to settle or resolve the CDS Lawsuit because BB&T is claiming a "right" to the Bond that BB&T simply does not have.

45.   BB&T knowingly and tortiously interfered in settlement negotiations it knew were taking place in the CDS Lawsuit and in doing so caused harm to Debtor, which has now hindered its dealings with CDS.

46.   The parties in the CDS Lawsuit were working towards a mutual resolution of the matter and had set the case for mediation on November 28, 2012. Moreover, the Debtor was in the process of reaching deal terms with CDS whereby CDS's claim in the CDS Lawsuit would be resolved and the Bond released to satisfy CDS's Lien. However, due directly to the tortious interference of BB&T, negotiations with CDS have become more difficult, mediation was cancelled, and the instant bankruptcy action was necessitated.

47.   Further, there is no reason for BB&T to file the injunction. Under the Escrow Letter, BB&T was going to contractually receive any excess from any settlement reached with CDS from the Bond. Further, there is no relation between BB&T and the CDS Lawsuit. In fact, BB&T is not a party to the CDS Lawsuit nor is BB&T the named Bond obligee. In addition, the Foreclosure Action referenced above has nothing to do with the CDS Lawsuit (although BB&T is entitled to the excess/residual of any settlement reached with CDS, per the Escrow Letter). Therefore, BB&T was not a proper claimant with regard to the Bond and not entitled to the relief sought by its injunction.

48.   Nevertheless, BB&T acted tortiously and against the rights of the Debtor by alleging that it had information that settlement of the CDS Lawsuit was "imminent" and that it was entitled to the full Bond.

49.   Consequently, the Debtor has been damaged in its negotiations with CDS and the Debtor is being "held hostage" to BB&T (and CDS), and cannot resolve the CDS Lawsuit (because

-11-

Platte River cannot release the Bond until the BB&T Injunction is dissolved), thereby forcing it to bring the instant action seeking relief under Chapter 11 of the U.S. Bankruptcy Code.

### Argument

50.    Section 510(c) of the Bankruptcy Code allows the Bankruptcy Court to subordinate "all or part of an allowed claim to all or part of another allowed claim" "under principles of equitable subordination."

51.    Originating in bankruptcy law, "the purpose of equitable subordination is to undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors." *In re Kansas City Journal–Post Co.,* 144 F.2d 791, 800 (8th Cir. 1944); *Branch Banking & Trust Co. of Virginia v. M/Y BEOWULF*, 2012 WL 464002, *8 (S.D.Fla. 2012).

52.    To state a claim for equitable subordination, a claimant must show (1) that the respondent engaged in some type of inequitable conduct, and (2) that the misconduct resulted in injury to creditors/claimants or conferred an unfair advantage on the respondent. Inequitable conduct is regarded as a wrong or unfairness, or "at the very least, a masquerade of something for what it is not," *In re Lifschultz Fast Freight,* 132 F.3d 339, 344 (7th Cir. 1997), and typically falls into one of the following categories: (1) fraud, illegality, or breach of fiduciary duties (2) undercapitalization; or (3) a creditor's use of the debtor as mere instrumentality or alter ego. *Lischultz* at 344–45; *M/Y BEOWULF*, 2012 WL 464002 at *8.

53.    Courts consider a three-prong balancing test in determining whether to equitably subordinate a claim: (1) whether the creditor has engaged in some sort of inequitable misconduct; (2) whether the misconduct has resulted in injury to other creditors or in unfair advantage to the offending creditor; and (3) subordination of the debt is not inconsistent with other provisions of the

-12-

Bankruptcy Code. *In re N&D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir. 1986). Also, if the creditor is not an insider or fiduciary, the trustee or Debtors in possession must prove with particularity that the creditor engaged in egregious conduct such as fraud, spoliation, or overreaching. *Id.* (citing *In re Ludwig Honold Mfg. Co.*, 46 B.R. 125 (Bankr. E.D. Pa. 1985)).

54.      Although the level of egregious conduct necessary for equitable subordination is high, and the doctrine typically limited to cases where a creditor is an insider or manager of the debtor, or where the creditor has exercised substantial control over the debtor, this does not necessarily eliminate the possible subordination of BB&T's unsecured claim in this matter. *See e.g. In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1362 (1st Cir. 1992); *In re Osborne,* 42 B.R. 988, 996–97 (W.D.Wis. 1984) (equitable subordination directed based on lender's misrepresentations to another creditor about debtor's prospects for payment; while lender knew debtor was struggling and likely unable to pay creditors, lender encouraged them to continue dealing with debtor, thus improving its own prospects for payment). *M/Y BEOWULF*, 2012 WL 464002 at *9.

55.      The facts set forth above certainly warrant the equitable subordination of BB&T's unsecured claim because BB&T has clearly engaged in inequitable misconduct and that misconduct has resulted in an unfair advantage to BB&T, and directly lead to the instant bankruptcy action.

56.      For example, BB&T entered written forbearance agreements with the Debtor and then materially altered those agreements both orally and by course and conduct and allowed the Debtor to accrue interest and then pay that interest off at the closing of the sales of Phases I and II.  BB&T permitted the payment of interest at closing for both Phases I and II.

57.      However, with the development of Phase III (the last phase of the Project), after BB&T accepted and received $10.4 million on an $11.6 million loan, BB&T did a 180-degree about

face and reneged its agreement to allow the interest to accrue, and without notice to Debtor, declared a "default" under the Second Amended Forbearance Stipulation and sought to foreclose its interest in Phase III.

58.     Further, BB&T directly interfered with WSG and its ability to resolve a separate lawsuit involving CDS, another of WSG's creditors in this bankruptcy.  BB&T was not a party to the CDS Lawsuit in which Platte River issued the Bond nor was BB&T the named Bond Obligee under the Bond.  Therefore, BB&T was not the proper claimant with regard to the Bond and was not entitled to the temporary injunction it received.

59.     More to the point, BB&T's actions directly interfered with the ongoing settlement negotiations between WSG and CDS and resulted in the cancellation of an agreed mediation between WSG and CDS.  BB&T and its counsel were fully aware of their actions and aware of the fact that it was directly and tortiously interfering with WSG's ability to resolve the CDS Lawsuit.

60.     BB&T's tortious action directly barred Platte River from using the Bond to pay CDS's claim in the CDS Lawsuit.  As a result, it has become more difficult for WSG to resolve its case with CDS.

61.     Clearly, in the instant matter, BB&T has engaged in inequitable (and unlawful) misconduct which directly caused damaged to WSG.  That misconduct has indirectly resulted in injury to other creditors and in an unfair advantage to BB&T and the subordination of BB&T's debt is not inconsistent with any other provisions of the Bankruptcy Code.

62.     Therefore, BB&T's allowed unsecured claim, if any, should be equitably subordinated to the claims of each of the Debtors' other unsecured creditors.

WHEREFORE, the Debtors respectfully request this Court enter an Order equitably

-14-

subordinating the entire amount of BB&T's allowed unsecured claim to the claims of general unsecured creditors, and for such other relief as this Court deems fair and equitable.

Dated this 31st day of December 2012.

/s/ R. Scott Shuker
**R. Scott Shuker, Esq.**
Florida Bar No. 984469
rshuker@lseblaw.com
**Jason H. Klein, Esq.**
Florida Bar No. 0016687
jklein@lseblaw.com
**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
**bknotice@lseblaw.com**
111 N. Magnolia Ave., Suite 1400
Orlando, Florida 32801
Tel.:        407-481-5800
Fax:        407-481-5801
*Attorneys for Debtor WSG Coral Springs, LP*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                       CASE NO. 6:12-bk-15882-KSJ

WSG CORAL SPRINGS, LP,                       CHAPTER 11

                Debtor.
_____/

### CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true copy of the **DEBTOR'S MOTION TO EQUITABLY SUBORDINATE UNSECURED CLAIM OF BB&T, N.A.,** has been furnished either electronically and/or by U.S. First Class, postage prepaid mail to: **WSG Coral Springs, LP,** c/o Eric Sheppard, 400 Arthur Godfrey Road, Miami Beach, Florida 33140; **Stephen P. Drobny, Esq.,** Jones Walker, et al., 201 Biscayne Blvd., Suite 2600, Miami, Florida 33131; the **Local Rule 1007-2** Parties-in-interest list, as shown on the matrix attached to the original of this statement filed with the Court; and the **U.S. Trustee,** 400 W. Washington Street, First Floor, Orlando, Florida 32801; this 31st day of December 2012.

                                 /s/ R. Scott Shuker
                                 **R. Scott Shuker, Esq.**

Label Matrix for local noticing
113A-6
Case 6:12-bk-15882-KSJ
Middle District of Florida
Orlando
Mon Dec 31 09:29:18 EST 2012

Branch Banking and Trust Company
c/o Stephen P. Drobny, Esq.
Jones Walker
201 So. Biscayne Boulevard
Suite 2600
Miami, FL 33131-4341

Florida Dept of Revenue
P.O. Box 6668
Tallahassee, FL 32314-6668

IRS
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA 19101-7346

Todd M. Hoepker, PA
PO Box 3311
Orlando, FL 32802-3311

WSG Coral Springs, LP
PO Box 546918
Miami Beach, FL 33181

United States Bankruptcy Court
George C. Young Federal Courthouse
400 West Washington Street
Suite 5100
Orlando, FL 32801

Branch Banking & Trust Co
c/o Stephen P Drobny Esq
Jones Walker
201 S Biscayne Blvd Ste 2600
Miami, FL 33131-4341

Branch Banking and Trust Company
c/o Stephen P. Drobny, Esq.
201 So. Biscayne Boulevard, Suite 2600
Miami, FL 33131-4341

CDS Sitework & Trucking Inc
Attn: Pres/Gen Mgr
12601 Avalong Road
Winter Garden, FL 34787-9772

CDS Sitework & Trucking Inc
c/o Leslie K O'Neal Esq
3906 S Summerlin Ave
Orlando, FL 32806-6906

Chiodini Associates
1401 S Brentwood Blvd #425
St Louis, MO 63144-1493

Dawn Giebler-Millner Esq
Greenberg Traurig
450 S Orange Ave #650
Orlando, FL 32801-3311

Eric D Sheppard
PO Box 546918
Miami Beach, FL 33154-6918

Florida Department of Revenue
Bankruptcy Unit
Post Office Box 6668
Tallahassee FL 32314-6668

HM Eight, LLC
c/o HM Eight Manager, LLC
12000 Biscayne Blvd, Ste 508
N Miami, FL 33181-2703

Holland & Knight
Attn: Mging Partner
10 Grove Street
Cherry Hill, NJ 08002-2791

Internal Revenue Service
Centralized Insolvency Ops
PO Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
Post Office Box 7346
Philadelphia PA 19101-7346

James Shepard Esq
145 Middle Street Ste 1121
Lake Mary, FL 32746-3594

Jason Block Esq
Berman Rennert
100 SE 2d Street, Ste 2900
Miami, FL 33131-2119

Jason R Block, Esq
a/f WSG Coral Springs
Bennan Rennert
100 SE 2nd St, Suite 2900
Miami, FL 33131-2119

Jim McCrae Esq
1349 International Pkwy S
Suite 2421
Lake Mary, FL 32746-1400

Joe Fish
1045 Tulloss Road
Franklin, TN 37067-8113

Kenneth Huto Esq
842 S Missouri Ave
Lakeland, FL 33815-4740

Leslie K O'Neal Esq
3906 S Summerlin Ave
Orlando, FL 32806-6906

Michael Crosbie Esq
Michelle Sullivan Esq
300 S Orange Ave Ste 1000
Orlando, FL 32801-5403

Michael Krekstein Esq
Fineman, Krekstein & Harris
1735 Market Street, Ste 600
Philadelphia, PA 19103-7513

Orange County Tax Collector
Attn: Earl K. Wood
Post Office Box 2551
Orlando FL 32802-2551

Orange Cty Tax Collector
PO Box 2551
Orlando, FL 32802-2551

Philip Wolman
PO Box 546918
Miami Beach, FL 33154-6918

Platte River Ins Company
c/o Julie Fox Esq
5020 W Cypress St
Tampa, FL 33607-3842

RSPGA Waterford
PO Box 546918
Miami Beach, FL 33154-6918


RSS Waterford
PO Box 546918
Miami Beach, FL 33154-6918

SO Revocable Trust
PO Box 546918
Miami Beach, FL 33154-6918

St Johns Water Mgmt District
Office of General Counsel
4049 Reid Street
Palatka, FL 32177-2571


Stuart Levine Esq
Thomas Valentine Esq
601 Bayshore Blvd Ste 720
Tampa, FL 33606-2760

Todd Hoepker Esq
Todd Hoepker PA
55 E Pine Street
Orlando, FL 32801-2617

Todd M. Hoepker, PA
c/o Todd M. Hoepker, Esquire
PO Box 3311
Orlando, FL 32802-3311


Travis Fulford Esq
505 Maitland Ave Ste 1000
Altamonte Springs, FL 32701-6306

UP Development
c/o Scott Fish
1045 Tullose Road
Franklin, TN 37067-8113

United States Trustee - ORL
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801


WSG Coral Springs GP, LLC
c/o WSG Development Co
PO Box 546918
Miami Beach, FL 33154-6918

William Asma Esq
884 S Dillard Street
Winter Garden, FL 34787-3910

Jason H Klein
Latham Shuker Eden & Beaudine LLP
P.O. Box 3353
Orlando, FL 32802-3353


R Scott Shuker
Latham Shuker Eden & Beaudine LLP
Post Office Box 3353
Orlando, FL 32802-3353

End of Label Matrix
Mailable recipients    45
Bypassed recipients     0
Total                  45